UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DARRELL GREEN,

        Plaintiff,

v.                                Case No. 5:03-cv-252-Oc-10GRJ

DONALD A. MCKELVY, et al.,

        Defendants.

_____

## ORDER OF DISMISSAL

This case was initiated upon the filing of a Civil Rights Complaint on July 7, 2003.  (Doc. 1.)  Plaintiff is currently proceeding on an Amended Complaint.  (Doc. 35.)  In the Amended Complaint, Plaintiff names the following Defendants in their individual and official capacities: Donald A. McKelvy, former Warden; Dennis Johnson, Associate Warden; Mimi Potts, Associate Warden; Steve Jenkins, Captain; Scott Lyngaas, Special Investigator; Abdurrahman Sykes, Chaplain; Lee H. Green, Disciplinary Hearing Officer; Angie Wiesman; Deputy Regional Counsel; Roy Holt, Regional Director; Harrell Watts, Administrator of National Inmate Appeals; Lisa Sunderman, Regional Counsel; Caixa Santos, Legal Instruments Examiner; and Ralph E. Hopkins, Assistant United States Attorney.  This case is before the Court on the Defendants' Motion to Dismiss the Amended Complaint or, in the Alternative, Motion for Summary Judgment.  (Doc. 38.)  A review of the file shows that Plaintiff did not file a response to the Defendants' motion and the time for doing so has

passed.[1]  Accordingly, this case is ripe for review.

## Claims of Complaint

In the Amended Complaint, the Plaintiff states three claims for relief:

(1) Defendants McKelvy, Johnson, Potts, Jenkins, Lyngaas and Sykes, conspired to punish Plaintiff in retaliation for his exercising his constitutional right to request religious services and to associate or disassociate with any religious group or person.

(2) Defendants McKelvy, Johnson, Potts, Jenkins, Lyngaas, and Sykes, failed to prevent or to aid in preventing the wrongs committed against Plaintiff under Count One.

(3) The Defendants conspired to cover-up the wrongs committed against Plaintiff under Count One.

## Factual and Procedural History

In the Amended Complaint, Plaintiff alleges that the events giving rise to his claims occurred at the Coleman Federal Correctional Complex after it had become known to Plaintiff and other Sunni Muslims that the newly hired Chaplain, Chaplain Sykes, was not a Sunni Muslim as they were told.  Because Chaplain Sykes was actually a Sufi Muslim, a sect diametrically opposed to the beliefs of the Sunnis, Plaintiff and other Sunni Muslims no longer felt they could participate in any services lead by Chaplain Sykes.

---

[1] Plaintiff was advised of the consequences of failing to respond to a motion for summary judgment in the Court's Order Directing Service of Process and Notice to Plaintiff.  See  Doc. 10 at 3.

Therefore, on or about September 15, 2002, Plaintiff, and most of the other Sunni Muslims, submitted requests to be taken off the institutional call out to participate in the Friday Jum'ah services performed by Chaplain Sykes.  In addition, the Sunni inmates spoke with Defendant Potts and requested that Chaplain Sykes not be allowed to lead their services.  Defendant Potts denied this request.

Soon after, Plaintiff alleges that the administration began preventing the Sunni Muslims from praying anywhere but at chapel.  Any Sunni Muslims caught praying in a place other than the chapel were threatened.  Eventually, the Sunni inmates were even denied prayer space in the chapel unless the prayer was led by Chaplain Sykes.  As a result, the Sunni inmates pleaded with Defendants Johnson and Jenkins for the opportunity to have services not led by Chaplain Sykes.  After those requests were denied, the Sunni inmates began submitting administrative remedy requests stating that they were being forced to practice the religious beliefs of Chaplain Sykes.

Shortly thereafter, Defendant Lyngaas and other special investigators, began searching the cells of the Sunni Muslim inmates.   In addition, the special investigators harassed and threatened the Sunni inmates.  Specifically, the Sunni inmates were told that they would be placed in the Special Housing Unit (SHU) if they did not participate in the services led by Chaplain Sykes.

On September 2, 2002, Plaintiff submitted an administrative remedy to the Warden explaining the situation of the Sunni Muslims.  In his response to Plaintiff's

3

remedy, the Warden found that the actions of the Defendants were appropriate in light of security concerns.  However, a meeting was arranged between Defendant Potts and one of the Sunni inmates, Samuel Railey.  At that meeting, Defendant Potts accused inmate Railey and others of forcing the other Sunni Muslims to not participate in services led by Chaplain Sykes.  When inmate Railey denied these accusations, Defendant Potts threatened to place inmate Railey, and several other Sunni Muslim inmates in the SHU.  Defendant Potts allegedly showed inmate Railey a list of Sunni inmates "targeted" by the administration.

The following day, inmate Railey again met with Defendant Potts, with Defendant Johnson also present.  At that meeting, Defendant Johnson arranged for inmate Railey to meet with Chaplain Sykes in order to work out a solution to the situation.  Inmate Railey agreed.  Two meetings between inmate Railey and Chaplain Sykes proved fruitless so Defendant Johnson arranged to be present at a third meeting between the two parties.  At that meeting on October 22, 2002, Chaplain Sykes allegedly admitted that he was not Islamically qualified to lead Sunni Muslim services.  Therefore, it was agreed that Chaplain Sykes would no longer lead Sunni Muslim services, however, he would be present to monitor the proceedings.  Also involved in the meeting were Defendant Potts and Defendant McKelvy.

Later that day, prior to Sunni Muslim services, inmate Railey informed the other Sunni Muslims about the compromise made between himself and the

4

administration with regard to Chaplain Sykes leading Sunni services.   After explaining the agreement, one Sunni inmate, Shahborn Emmanuel, stated that he could not accept such an agreement unless or until Chaplain Sykes agreed to repent from his beliefs.   Plaintiff and others told inmate Emmanuel that it was not necessary for Chaplain Sykes to repent his beliefs in order to pray with them.   At the conclusion of this discussion, the majority of the Sunni Muslims prayed with Chaplain Sykes, with inmate Railey leading the prayer.   Three others chose not to pray with Chaplain Sykes present.

On October 23, 2002, at approximately 5:30 a.m., Plaintiff and eleven other Sunni inmates were awakened by a riot team in full gear and taken to the SHU. Upon their arrival at the SHU, each inmate was given a document stating that he was being placed in administrative detention pending investigation for conduct that disrupts or interferes with the security and orderly running of the institution.   Each inmate was later interviewed by Defendant Lyngaas who asked each of them what it would take for the Sunni Muslims to pray behind Chaplain Sykes.   All of the Sunni inmates in the SHU told Defendant Lyngaas that they would not pray with Chaplain Sykes leading prayer.

On February 14, 2003, each of the Sunni Muslims in the SHU received an incident report for conduct which disrupts and interferes with the secure and orderly running of the institution and for threatening bodily harm.   Those reports were later suspended and the Sunni inmates were given new incident reports for interfering

with staff in the performance of their duties, like engaging in or encouraging a group demonstration, for demanding that Chaplain Sykes repent his beliefs.  Disciplinary hearings were held on March 14, 2002, at which time Plaintiff was found guilty by the Disciplinary Hearing Officer (DHO), Defendant Green.

Plaintiff appealed his DHO finding on April 21, 2003.  After not receiving a response, Plaintiff wrote a letter of inquiry to the regional office on June 23, 2003.  On or about July 7, 2003, Plaintiff received a response to his letter.  In the response, Defendant Wiesman informed Plaintiff that his appeal had been rejected on April 25, 2003, for the failure to comply with the filing requirements of the administrative remedy process.[2]  A copy of the original rejection notice was enclosed for Plaintiff's convenience.  On the original rejection notice, Plaintiff was advised that he had ten days to correct the filing error and resubmit his complaint.  Plaintiff corrected the filing mistake and resubmitted his appeal, along with a letter explaining why his resubmission was being filed outside the ten-day window stated on the notice.

During the pendency of Plaintiff's appeal, he was sent to the United States Penitentiary in Atlanta, Georgia, pending his transfer to the Federal Correctional Institution in Edgefield, South Carolina (FCI Edgefield).  While at the Atlanta transit center, Plaintiff received the regional response to his DHO appeal.  Plaintiffs' appeal was rejected as untimely for failing to resubmit his appeal within the appropriate ten day deadline.  On September 2, 2003, Plaintiff submitted an appeal of the rejection

---

[2] Plaintiff's appeal was rejected for attaching too many continuation pages.

6

to the regional office.  In his appeal, Plaintiff requested his DHO appeal be reinstated because the untimeliness of his first appeal was not his fault.

On September 22, 2003, Plaintiff received a response to his second appeal. In the response, the regional office stated that Plaintiff's appeal was granted. Furthermore, the regional office concurred with the interpretation of the incident by DHO Green and Plaintiff's appeal of his DHO hearing was denied.  Plaintiff appealed that decision to the Central Office of the Bureau of Prisons (BOP).  The decision by DHO Green was affirmed on appeal.

During the pendency of Plaintiff's administrative appeal of his DHO hearing, Plaintiff was transferred to FCI Edgefield.  Upon his arrival, Plaintiff was told by staff that he would not be admitted to the general population.  Instead, he must remain in the SHU for one-full year.  Plaintiff submitted a grievance to the Warden at FCI Edgefield.  Plaintiff was advised that he was being held in the SHU for adjustment purposes.  Plaintiff appealed the response from the Warden to the Southeast Regional Office and requested documents pertaining to his transfer.  In addition, at or near that same time, Plaintiff submitted a Freedom of Information Act request to the regional office of the BOP seeking information regarding his transfer.  Plaintiff was advised by the regional director that his transfer resulted from an investigation at FCC Coleman and Plaintiff's poor institutional adjustment.

Plaintiff filed the instant case on July 7, 2003, while he was at the Atlanta transit center and during the pendency of his DHO appeals.  Plaintiff alleges that

Defendants Santos and Hopkins joined the conspiracy to cover-up the wrongs perpetrated against Plaintiff when they knowingly swore to or filed false documents in this case. Moreover, Defendants Sunderman and Wiesman joined the conspiracy when they failed to send Plaintiff the documents he requested in his FOIA requests to the regional office.

### The Defendants' Motion to Dismiss or for Summary Judgment

In their motion to dismiss, the Defendants argue that Plaintiff's Amended Complaint should either be dismissed or summary judgment granted because:

(1) Plaintiff fails to articulate any basis for the court to exercise jurisdiction over the individual federal Defendants.

(2) Defendants Green, Wiesman, Sunderman, Holt, Santos and Hopkins were not properly served.

(3) Plaintiffs' official capacity claims are barred by the doctrine of sovereign immunity.

(4) Plaintiff failed to properly exhaust his administrative remedies prior to filing suit.

(5) Plaintiff does not meet the minimal standing requirements.

(6) Plaintiff fails to state a <u>Bivens</u> claim against any individual defendant because he fails to advance a short and plain statement of the claim showing that he is entitled to relief.

(7) Plaintiff has failed to prove qualified immunity is inapplicable because

8

Plaintiff fails to show any violation of a clearly established constitutional right.

## Official Capacity Claims

Plaintiffs' official capacity claims against the Defendants are barred by the doctrine of sovereign immunity.  Asserting a claim against a federal employee in his or her official capacity is the same as asserting a claim against the United States.[3]  However, "[t]he United States, as sovereign, is immune from suit, save as it consents to be sued."[4]  Because the United States has not waived its sovereign immunity for  an award of damages arising from proposed violations of the Constitution,[5] Plaintiff's official capacity claims against the Defendants are due to be dismissed with prejudice.

## Individual Capacity Claims

Pursuant to the Prison Litigation Reform Act (PLRA):

> (a) Applicability of Administrative Remedies. No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.[6]

As this exhaustion requirement applies to both state and federal prisoners,[7]

---

[3] Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099 (1985)

[4] United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769 (1941).

[5] FDIC v. Meyer, 510 U.S. 471, 485-86, 114 S.Ct. 996, 1005-1006 (1994).

[6] 42 U.S.C. §1997(e).

[7] Alexander v. Hawk, 159 F.3d 1321, 1324-25 (11th Cir. 1998).

Plaintiff in this case is required to exhaust his administrative remedies before filing suit regardless of the relief offered through the administrative procedures. Id at 1325. The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes"[8] and a court does "not review the effectiveness of those remedies, but rather, whether remedies were available and exhausted."[9] Under the PLRA, all available administrative remedies must be exhausted whether suit is filed under §1983 or other federal laws. Porter at 988.

The BOP makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. See 28 C.F.R. § 542.10, et seq. The administrative remedy process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal that decision to the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For an inmate at the Coleman Federal Correctional Complex, this appeal would be filed with the Southeast Regional Office of the BOP in Atlanta, Georgia.) If the Regional Office denies relief, the inmate can appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal. An inmate must fully complete each level of the

---

[8] Porter v. Nussle, 122 S. Ct. 983, 992 (2002).

[9] Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999) (citing Alexander at 1326).

10

process in order to exhaust his administrative remedies.

A review of Plaintiff's administrative remedies shows that Plaintiff initiated the BOP' administrative remedy process on October 1, 2002, by filing a request for administrative remedy to the Warden.[10]  In his request, Plaintiff stated that he and the other Sunni Muslims at Coleman USP were being intimidated and forced to practice a different religion, namely Sufism, because of Chaplain Sykes.  In support of his claim, Plaintiff alleged that the Sunni Muslims were being:

(1) forced to not make the call to prayer or to call to pray with the door closed;

(2) forced to pray congregational prayer in groups of three;

(3) denied access to purchase different religious items and being told that Friday Jum'ah Services are not mandatory;

(4) forced to have all the Sunni Muslim services run by Chaplain Sykes, a Sufi Muslim;

(5) forced to go to services conducted by Chaplain Sykes and were forced to stay, even though they had requested to be taken off the call-out for such services;

(6) threatened to be locked in the SHU; and,

(7) threatened with transfer from the institution.

As relief, Plaintiff requested that the Sunni Muslims be free to practice their own religion without intimidation.

In responding to the Plaintiff's grievance, the Warden found that there was no

---

[10] See Defendants' Motion to Dismiss (Doc. 35), Ex. 16 at 2-3.

evidence to support the Plaintiff's claims.  The Warden specifically stated:

> Investigation of this matter reveals you provide no evidence to support your claim you are being intimidated or forced to accept or conform to a belief that is not yours nor that you are being refused a place to worship.  This institution provides spiritual guidance and leadership to all Muslims regardless of their sect.   Religious Services provides each Muslim the opportunity for congregational prayers by conducting Jumah each Friday afternoon.  Additionally, you are afforded the opportunity to use the Chapel for the Fajr, Zuhoor, Aser, and Magrib prayers, and you have also been authorized to pray in your cell in groups of three.  The call to prayer is for Muslim believers and as only three Muslims are allowed to pray in each cell it is not necessary to call the prayer with the door open.
>
> A review of the Religious Services' cost center revealed numerous purchases were made for the Islamic community to include Qurans, books, video tapes, oils, prayer rugs, etc.  A further investigation revealed Inmate Requests to Staff Member (copouts) submitted for removal from attendance to the Friday, September 27, 2002, prayer service were not submitted in a timely manner.  However, inmates were released shortly after their arrival to the chapel and were not forced to attend the service.
>
> Your request for Administrative Remedy has been **DENIED**.[11]

(Emphasis in original).

Plaintiff appealed the denial of his institutional remedy to the Regional Office. [12] In his appeal, Plaintiff reiterated the claims made in his institutional appeal and again requested to be free to practice his religion.  In response to that appeal, the

---

[11] See Defendants' Motion to Dismiss (Doc. 35), Ex. 16 at 4.

[12] See Defendants' Motion to Dismiss (Doc. 35), Ex. 17 at 1-2.

Southeast Regional Director found:

> You allege you are being discriminated against because you are not allowed to practice your Islamic faith and denied access to purchase various religious items. You request to be allowed to worship as a Sunni Muslim without a Chaplain leading the prayer.
>
> An investigation into your complaint revealed the United States Penitentiary (USP) at Coleman offers an Islamic worship service led by the Chaplain on Fridays. Every Chaplain is expected to personally lead prayer or worship on a regular basis. Ordinarily, inmates are not permitted to lead religious programs. The order of worship for the general Islamic worship is not limited to the Chaplain's own denominational ritual. The worship does incorporate readings and prayer in a way that provides a comfortable worship environment for persons of all Islamic denominations. USP Coleman provides several different Islamic programs. Because the number of Islamic groups are numerous, the orderly running of the institution would be affected if each Islamic group received a separate service. All religious services are by choice and no evidence could be found which required mandatory attendance. Inmates in groups of three or less may pray in their cells. Thus, opportunities exist for prayer apart from the chapel schedule. The review also indicated items have been purchased and made available for inmate use by the Chaplaincy Services at USP Coleman.
>
> Accordingly, your Regional Administrative Remedy Appeal is denied.[13]

Not satisfied with the response from the Regional Office, Plaintiff filed an appeal with the Central Office of the BOP.[14]  In his Central Office appeal, Plaintiff complained that the Regional Director did not truly look into his complaint. Further,

---

[13] See Defendants' Motion to Dismiss (Doc. 35), Ex. 17 at 3.

[14] See Defendants' Motion to Dismiss (Doc. 35), Ex. 17 at 4-5.

Plaintiff again argued that Sunni Muslims were being forced to practice a different religion because the Chaplain was a Sufi Muslim.  In addition, Plaintiff argued that Chaplain Sykes was not Islamically qualified to lead Muslim services.  In his Central Office appeal, Plaintiff sought compensation for the "deprivation and oppression" that he had suffered and sought to have Chaplain Sykes removed from conducting Muslim services.

In denying Plaintiff's Central Office appeal, the Administrator of National Inmate Appeals found that FCC Coleman had "provided a reasonable means for [Plaintiff] to practice [his] religion, Sunni Muslim."[15]  Accordingly, Plaintiff's Central Office Appeal was denied.

Construing Plaintiff's administrative remedy forms liberally, Plaintiff has exhausted a claim that his right to freely practice his religion was impeded by the actions of the Defendants.  However, that is not the issue raised in the instant complaint.  Here, Plaintiff alleges only that the Defendants were involved in a conspiracy to punish him in retaliation for Plaintiff exercising his right to freely practice his religion.  Further, Plaintiff alleges that the Defendants failed to protect him from the conspiracy and conspired to cover-up the wrongs committed against the Plaintiff.  Moreover, most of the Defendants are not even mentioned in Plaintiff's administrative remedy requests, and those that are named, are only mentioned in general terms.  Plaintiff does not state any specific instances in which his rights were

---

[15] See Defendants' Motion to Dismiss (Doc. 35), Ex. 17 at 6.

violated or even the particular rights he believes were violated. Therefore, the BOP has only addressed whether the institution, in general, denied him the right to freely practice his religion.[16] The BOP has never had the opportunity to address whether a conspiracy existed, whether the Defendants failed to protect Plaintiff from the conspiracy or whether a cover-up exists.[17] In addition, to the extent that Plaintiff actually alleges that the actions of the Defendants were retaliatory, that issue was never raised in Plaintiff's administrative remedies either.

Accordingly, even after the most liberal reading of Plaintiff's administrative remedies, the Court finds that Plaintiff has not exhausted his administrative remedies with regard to the issues raised in the Amended Complaint. Moreover, because Plaintiff did not raise those issues within the appropriate time frame, and cannot now do so,[18] those issues are procedurally defaulted and are barred from further consideration by this Court.[19] Thus, Plaintiff's claims against the Defendants in their

---

[16] In addition, the Court notes that since the filing of his Complaint, Plaintiff has also exhausted his challenge to his disciplinary report. Because Plaintiff does not challenge his disciplinary report in this proceeding, the Court has not addressed that issue. However, the court does take notice of the fact that the Plaintiff did not exhaust the challenge to his disciplinary report prior to the filing of the Complaint as required by the PLRA. Therefore, even had Plaintiff raised that issue in the instant Complaint, that issue would be due to be dismissed for the failure to exhaust administrative remedies.

[17] Alexander, 159 F.3d at 1327 (the following policies are promoted by requiring the exhaustion of administrative remedies: "(1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources . . . ; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that 'frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures'") (citation omitted).

[18] See 28 C.F.R. § 542.14 ("The deadline for completion of a informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate for (BP-9), is 20 calendar days following the date on which the basis for the Request occurred.").

[19] See Johnson v. Meadows, 418 F.3d 1152 (11th Cir. 2005) (finding that the exhaustion requirement of the PLRA contains a procedural default component).

individual capacities are due to be dismissed with prejudice.

### Conclusion

For the reasons set forth in this Order, the Defendants' Motion to Dismiss the Amended Complaint or, in the Alternative, Motion for Summary Judgment (Doc. 38) is **GRANTED**.  The Clerk is directed to enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** at Ocala, Florida, this 22nd day of September 2005.

_____
UNITED STATES DISTRICT JUDGE

c:  Darrell Green
    Counsel of Record

16